800 So.2d 715 (2001)
SUN `N LAKE OF SEBRING IMPROVEMENT DISTRICT, a special district and public corporation of the State of Florida; and Larry Fuchs, Executive Director, Department of Revenue, State of Florida, Appellants,
v.
C. Raymond McINTYRE, Property Appraiser for Highlands County, Florida; and Charles L. Bryan, Tax Collector for Highlands County, Florida, Appellees.
No. 2D99-3196.
District Court of Appeal of Florida, Second District.
December 5, 2001.
*716 John K. McClure of Swaine, Harris, Sheehan & McClure, P.A., Sebring, for Appellant Sun `N Lake of Sebring.
Robert A. Butterworth, Attorney General, Tallahassee, and Joseph C. Mellichamp, III, Senior Assistant Attorney General, Tampa, for Appellant Larry Fuchs.
Larry E. Levy of The Levy Law Firm, Tallahassee, for Appellee C. Raymond McIntyre.
No appearance for Appellee Charles Bryan.
Kevin S. Hennessy and Eric Ash of Lewis, Longman & Walker, P.A., West Palm Beach, for Association of Special Districts, Inc., Amicus Curiae.
ALTENBERND, Acting Chief Judge.
Sun `N Lake of Sebring Improvement District (District) appeals a final summary judgment entered in favor of the defendants, C. Raymond McIntyre (Property Appraiser) and Charles L. Bryan (Tax Collector), denying the District certain ad valorem tax exemptions. Larry Fuchs, as executive director of the Department of Revenue (Department), joins in the appeal as it relates to the constitutionality of section 189.403(1), Florida Statutes (1997). The Association of Special Districts (Association) has filed an amicus brief supporting the District's position. We affirm in part and reverse in part.
We reverse that part of the summary judgment that held section 189.403(1) unconstitutional because we conclude the Property Appraiser lacked standing to raise this issue. As a result, the District is entitled to exemptions for lots used for a *717 public purpose. We affirm that part of the judgment that held that the vacant lots held by the District and actively marketed for sale to private persons are not held exclusively for a public purpose and are therefore subject to ad valorem taxes. With respect to the golf course, tennis courts, restaurant, and pro shop, we conclude that there are insufficient facts in the record to determine whether these properties are held exclusively for a public purpose. We therefore remand the case for further proceedings consistent with this opinion.

FACTS
In 1974, Highlands County created the Sun `N Lake of Sebring Improvement District in order to fund the construction and maintenance of infrastructure for property located within its boundaries. Art. V., Div. 1, § 9-81, Highlands County Code. The District was created by Highlands County Ordinance 74-4. See § 125.01(1)(q), Fla. Stat. (1973) (granting counties authority to create such special districts). Pursuant to section 1.01(9), Florida Statutes (1973), the District is defined by statute as a political subdivision of the State of Florida. See also § 1.01(8), Fla. Stat. (2000).
The District is an independent special district as defined by the Uniform Special District Accountability Act of 1989. See ch. 89-169, Laws of Fla. (codified in §§ 189.401-427, Fla. Stat. (2000)). See ch. 80-407, Laws of Fla. (codified in §§ 190.001-.049, Fla. Stat. (2000)). An independent special district operates primarily as a vehicle to finance infrastructure and improvements necessary to support a developing community.[1] A district is authorized to issue bonds to fund the infrastructure of a community. The bonds are then secured by assessments on the property within the district. Developers often participate in the creation of special districts because this framework reduces the amount of private investment required to develop a community. Prospective homebuyers benefit from lower purchase prices for the property. Although the home-buyer must pay assessments on their property commensurate with their pro rata share of the bonds issued to build the infrastructure, these payments are treated as property taxes that may be deductible from their income for tax purposes. Counties could fund such infrastructure as a public expense from their general budgets, but creating a district allows them to benefit by having the property owners in the district bear the cost of these improvements without an overall increase in the county's budget and tax rates.
In this case, the District issued several series of tax exempt capital improvement bonds, much like municipal bonds, and sold them to the public to finance improvements. In 1991, however, the primary developer within the District, CFD, Incorporated, declared bankruptcy. CFD held title to thousands of lots that were subject to assessments necessary to pay the bond obligations of the District. As a result, the bankruptcy put in jeopardy the payment of outstanding bonds and the financial security of the entire District.[2]
*718 Faced with possible insolvency and struggling to fund services for existing residents, the District began foreclosure proceedings against the lots owned by CFD. The foreclosure of the lots was permitted by the District's charter and required by the trust indenture agreements. Between 1992 and 1993, the District obtained title to over 3,000 lots by purchasing them at foreclosure sales. Many lots are vacant and unimproved, without water, sewage, or drainage, and are scattered throughout the District, making installation of infrastructure economically unfeasible for individual private purchasers. The District does not lease or otherwise use any of these vacant lots for proprietary purposes.
Upon acquiring these lots, the District began active efforts to market and sell them. The District wanted to return the lots to private ownership so that the private owners could commence paying the special assessments necessary to repay the bonds. The District's only other alternative would have been to increase assessments against other owners in an amount that would have been disproportionate and cost prohibitive to those lot owners.
As part of its efforts to market the vacant lots and to further ease this financial quagmire, the District negotiated an agreement with bondholders[3] of the Phase Five bonds and a successor developer, Sun `N Lake, Inc., the title owner of 1,851 lots. This agreement sought to protect the bondholders by providing for the sale of lots and the disposition of the proceeds to satisfy the bond obligations.
In the agreement, Sun `N Lake, Inc., agreed to pay to the District a total of $700,000 and to convey title in 1,728 lots it owned to the District in lieu of foreclosure and as full satisfaction of liens for unpaid assessments. The agreement defined a "lot pool" consisting of these lots and others the District held due to foreclosure. Sun `N Lake, Inc., could buy lots from the lot pool, or sell them from the lot pool directly to third parties by paying the District $1 per lot, plus approved sale costs, any installment due under a note, any outstanding assessments, foreclosure costs, and all county taxes delinquent or then due. The net proceeds from the sale of lots within the pool was to be remitted to the Phase Five bondholders, resulting in the release of the lien of the Phase Five bond. The bondholders agreed to accept these payments and not to seek any further amounts.
Finally, the parties agreed that the District would not be responsible for county ad valorem taxes on any lots in the lot pool and would have no obligation to redeem those lots from a tax sale. Instead, Sun `N Lake, Inc., agreed to pay the ad valorem taxes on the lots it transferred into the pool, and the District agreed to notify the company of any statutory notices received from the county warning of an application for tax deed. In addition, the District *719 agreed to apply for an exemption from ad valorem taxes. However, if the District's reasonable efforts in this regard were unsuccessful, the agreement provided that "in no event shall the District in any way be responsible for the payment of any of the ad-valorem taxes imposed by Highlands County, Florida." This agreement apparently was the seed from which this lawsuit grew.
In February 1995, the District requested from the Property Appraiser an exemption from ad valorem taxation under section 196.199(1)(c), Florida Statutes (1995), for the thousands of lots it held. The District asserted that it was a political subdivision of the state entitled to an exemption for the vacant lots because they were used for public purposes. The Property Appraiser denied the exemption. Thereafter, in 1996, 1997, and 1998, the District again made timely applications for the same exemption on the same grounds, and the Appraiser denied each application. Beginning in 1997, the District also sought exemption for a country club and recreational facilities comprised of a golf course, tennis courts, pro shop, and restaurant. The Property Appraiser likewise rejected these exemption requests.
The District initiated timely lawsuits challenging the Property Appraiser's denial of the exemptions for the tax years 1995, 1996, and 1998. These cases were consolidated by agreement of the parties in the trial court, and the trial court entered one final summary judgment resolving all three cases. That judgment is the subject of this appeal.
To further complicate matters, while these proceedings were pending, the legislature passed chapter 97-255, Laws of Florida. This legislation amended section 189.403(1), Florida Statutes (1997), in an attempt to change the tax status of special district property. Section 189.403(1) previously provided in part:
(1) "Special district" means a local unit of special purpose, as opposed to general-purpose, government within a limited boundary, created by general law, special act, local ordinance, or by rule of the Governor and Cabinet. The special purpose or purposes of special districts are implemented by specialized functions and related prescribed powers.
Chapter 97-255, section 4, added a sentence immediately following this provision: "For the purpose of s. 196.199(1), special districts shall be treated as municipalities." Chapter 97-255 stated that this amendment was to "apply to the 1995 tax rolls and thereafter." After the enactment of this law, the Property Appraiser amended its pleadings to challenge the constitutionality of the amendment.
In the trial court, both the District and the Property Appraiser filed cross-motions for summary judgment. The parties stipulated that there were no disputed genuine issues of material fact and agreed to the documents to be included in the record for the purposes of summary judgment. The District argued that the amendment clarified its already-existing entitlement to ad valorem tax exemptions similar to those provided to municipalities, and that all of the property in dispute was being used for a public purpose as required to obtain the ad valorem tax exemption. The Property Appraiser responded that even under the amended statute, the District's property is subject to taxation because it is not being used for a public or governmental purpose. The Property Appraiser further argued that the 1997 amendment is unconstitutional as an invalid attempt to create an exemption not permitted by the Florida Constitution.
In its final summary judgment, the trial court ruled that the Property Appraiser *720 had standing to challenge the constitutionality of chapter 97-255, section 4, Laws of Florida, and that the legislation was, in fact, unconstitutional as an invalid attempt to create an exemption for special districts not permitted by the Florida Constitution. It further held that even if the District was treated as a municipality under chapter 97-255, section 4, the properties at issue were not held for a public purpose and therefore not exempt from taxation.

TAX STATUS OF SPECIAL DISTRICT PROPERTY
The District concedes that it is not entitled to immunity from ad valorem taxes. See Canaveral Port Auth. v. Dep't of Revenue, 690 So.2d 1226 (Fla.1996). Immunity from taxation is not derived from the state constitution; it arises from common law concepts of sovereign immunity. Dickinson v. City of Tallahassee, 325 So.2d 1 (Fla.1975). In Canaveral Port Authority, the Florida Supreme Court narrowly construed this immunity to apply only to counties, entities providing public education, and agencies, departments, or branches of state government that perform the administration of state government. 690 So.2d at 1228. Because it is not immune from ad valorem taxation, the District seeks an exemption from ad valorem taxes, asserting that it is a political subdivision entitled to such an exemption so long as the property it owns is being used for a public purpose.
Exemptions from ad valorem taxation generally arise from article VII of the Florida Constitution. Section 3(a) of article VII permits exemptions for property owned by a municipality and "used exclusively for municipal or public purposes," and permits exemptions for portions of property that are "used predominantly for educational, literary, scientific, religious, or charitable purposes." Sections 3(c), (d), and (e) permit counties or municipalities the right to grant very specific exemptions not applicable here. Article VII does not provide any exemption expressly applicable to an independent special district.
The District points to no constitutional basis for its exemption, but instead relies primarily on section 196.199(1)(c), Florida Statutes (1995), which provides in pertinent part:
(1) Property owned and used by the following governmental units shall be exempt from taxation under the following conditions:
. . . .
(c) All property of the several political subdivisions and municipalities of this state or of entities created by general or special law and composed entirely of governmental agencies ... which is used for governmental, municipal, or public purposes shall be exempt from ad valorem taxation, except as otherwise provided by law.
Pursuant to section 1.01(8), Florida Statutes (1995), the term "political subdivision" is defined to include "special tax school districts, special road and bridge districts, bridge districts, and all other districts in this state."
Section 196.199(1)(c) could thus be facially interpreted to provide special districts an exemption from ad valorem taxation when their property is used for a public purpose. The Florida Supreme Court, however, has determined that the legislature is without authority to grant an exemption from ad valorem taxes where the exemption has no constitutional basis. Archer v. Marshall, 355 So.2d 781 (Fla. 1978). See also Sebring Airport Auth. v. McIntyre, 783 So.2d 238 (Fla.2001). Courts are required to interpret statutes in such a manner as to uphold their constitutionality if it is reasonably possible to do so. Therefore, section 196.199(1)(c) must *721 be reasonably interpreted as a codification of the existing constitutional exemptions and not as an extension of them. See Capital City Country Club, Inc. v. Tucker, 613 So.2d 448 (Fla.1993) (refusing to interpret section 196.199(4) as granting an exemption not authorized by the constitution so as to avoid rendering statute unconstitutional). The reference to "political subdivisions" in section 196.199(1)(c) must therefore refer only to those political subdivisions entitled to immunity from ad valorem taxation. See Canaveral Port Auth., 690 So.2d 1226. Likewise, although the statute refers to property "used for governmental, municipal, or public purposes," article VII, section 3(a), clarifies that the property must be used "exclusively" for public or municipal purposes.
Thus, section 196.199(1)(c) does not itself provide the District with tax exempt status. However, the District argues that the legislature specifically provided the District with such an exemption by its enactment of chapter 97-255, section 4, Laws of Florida. In short, this act amended section 189.403(1) to define an independent special district as a "municipality" for those tax exemptions authorized by section 196.199(1).[4] The Property Appraiser recognizes that the amendment to section 189.403(1) purports to treat special districts as municipalities for the purpose of section 196.199, but the Property Appraiser challenges the constitutionality of the amendment.
In light of the supreme court's holdings in Archer, 355 So.2d 781, and Sebring Airport Authority, 783 So.2d 238, this argument may have merit. However, under our current case law, the Property Appraiser lacks standing to raise this constitutional challenge to the statute. See Turner v. Hillsborough County Aviation Auth., 739 So.2d 175 (Fla. 2d DCA 1999), review granted, 761 So.2d 332 (Fla. Jan.25, 2000) (table). In Turner, this court acknowledged the common law rule that state officers must presume legislation affecting their duties to be valid. They do not have standing to initiate litigation for the purpose of determining otherwise. Turner, 739 So.2d at 177 (citing Dep't of Educ. v. Lewis, 416 So.2d 455 (Fla.1982)).
In Turner, the property appraiser for Hillsborough County assessed a piece of property at a certain value without granting any portion of it a governmental tax exemption. The property owner successfully challenged the assessment before the value adjustment board, and the value adjustment board reassessed the property. The property appraiser then filed suit in the circuit court to challenge the adjustment board's decision. In this case, the Property Appraiser seeks to distinguish Turner by pointing out that the District initiated this lawsuit, and thus the Property Appraiser is raising the constitutionality of the statute as a proper defense. In Turner, however, we stated,
if the property appraiser had followed the law initially, as State ex rel. Atlantic Coast Line Railway Co. [v. State Board of Equalizers, 84 Fla. 592, 94 So. 681 (1922)] dictates he is obligated to do, the taxpayer would not have been forced to petition the VAB and set the litigation in motion. It both defies logic and violates the rule of State ex rel. Atlantic Coast Railway Co. to suggest that Turner *722 can ignore the law by denying an exemption based on his belief that it is unconstitutional and then be allowed to ask the court to approve his disobedience by upholding his denial.
Turner, 739 So.2d at 178. Thus, the mere fact that the Property Appraiser is not the named plaintiff in this suit does not permit him to avoid the dictates of Turner. As we did in Turner, we recognize that our decision in this regard conflicts with Fuchs v. Robbins, 738 So.2d 338 (Fla. 3d DCA 1998), and we certify conflict to the Supreme Court of Florida.
Because the Property Appraiser lacked standing to raise the issue of the constitutionality of section 189.403(1), the trial court erred in finding the provision unconstitutional. The Property Appraiser and the trial court were required to apply the statute to these three consolidated cases. Pursuant to sections 189.403(1) and 196.199(1), the District is to be treated as a municipality, and as such is entitled to an exemption if its property is used exclusively for a public purpose.[5]

PUBLIC PURPOSE V. PRIVATE PURPOSE
This appeal involves properties used for two distinct purposes. The majority of the property is vacant land, actively marketed by a developer for sale to private persons. The remaining property includes the property on which the District operates certain facilities, including a golf course, tennis courts, pro shop, and restaurant.
Whether the vacant lots are held for a public purpose is controlled by this court's opinion in City of Bartow v. Roden, 286 So.2d 228 (Fla. 2d DCA 1973). In Roden, this court held that vacant tracts of land held by the city of Bartow in an industrial park complex which were being held out and marketed for lease to private entities were not held exclusively for a public purpose. We can find no meaningful distinction between the land held out and marketed for lease to private interests for use in private ventures in Roden and the land held out and marketed for sale as homesites in this case. In both cases, the sale or lease of the land will confer a financial benefit upon the District or city. Nevertheless, the property is neither being used for a public purpose nor sitting idle in anticipation of a future, undetermined public use. The District has made an affirmative decision to market this land for use as a residential development.
We recognize that in City of Sarasota v. Mikos, 374 So.2d 458, 460 (Fla.1979), decided after Roden, the supreme court held that there is a presumption that vacant land held by a municipality is in use exclusively for a public purpose if it is not actually in use for a private purpose on tax assessment day. In Mikos, however, the city was holding the vacant land to meet the future needs of the public and to preserve natural open spaces. The city was not actively marketing the land for sale or lease to private interests. Mikos recognized and cited Roden without limiting or overturning its holding. Therefore, reading the two cases together and applying them to this case, the active marketing of lots to private interests for use as private homesites overcomes the presumption that vacant land is held exclusively for a public purpose. See also Page v. City of Fernandina Beach, 714 So.2d 1070 (Fla. 1st DCA 1998) (distinguishing Roden when municipality held vacant lots out for sale, but did not actively market them). This seems *723 particularly clear when the marketing is done, as in this case, through an agreement with private entities such as developers and bondholders that confers benefits upon the private enterprises. Although the District perceives this marketing as necessary to preserve its solvency and, thus, as providing a much-needed public benefit, the decision to actively market the lots for residential development results in the land no longer being held exclusively for a public purpose.
The second type of property at issue in this case is the recreational facilities maintained by the District. Our record does not contain sufficient detail about the nature of these facilities. It appears these facilities include a golf course, tennis courts, pro shop, and restaurant. It is possible that a golf course or tennis courts, owned by a municipality and held open to the public, and not operated in conjunction with a for-profit business, may serve an exclusively public purpose. Cf. Page, 714 So.2d 1070 (holding that operation of marina by city serves public purpose entitling city to tax exemption). See also Am. Golf of Detroit v. City of Huntington Woods, 225 Mich.App. 226, 570 N.W.2d 469 (1997) (likening certain golf courses to public parks). Our record, however, provides no insight into the nature of the golf course or tennis courts at issue here. For example, the record does not reflect whether these facilities are open to the public or require membership. See, e.g., Holiday Island Suburban Improvement Dist. No. 1 of Carroll County v. Williams, 295 Ark. 442, 749 S.W.2d 314 (1988). Although the operation of a pro shop and restaurant would not seem to serve an exclusively public purpose, we do not foreclose such a finding upon remand. Our record does not reflect how closely the recreational facilities maintained by the District are tied to the golf course and tennis courts, and whether they are operated in conjunction with a for-profit business. Because the record does not resolve the private or public purpose of these properties beyond a disputed issue of material fact, the trial court erred in entering summary judgment on this issue.
Affirmed in part, reversed in part, and remanded. Conflict certified with Fuchs v. Robbins, 738 So.2d 338 (Fla. 3d DCA 1998).
WHATLEY and STRINGER, JJ., Concur.
NOTES
[1] Much of the information regarding special districts in this opinion is from "Special Tax Districts," chapter 22, volume II, of Florida Environmental and Land Use Law (The Florida Bar 1994). This article provides a general overview of special districts in Florida.
[2] The record does not disclose the extent of the money owed by the District for outstanding bonds at any given time. The record contains resolutions, trust indentures, and final judgments approving the issuance of (1) $7,600,000 in special assessment bonds entitled "Phase One Bonds" in 1977; (2) $3,900,000 in special assessment bonds entitled "Phase Two Bonds" in 1978; (3) $15,900,000 and $513,000 in special assessment bonds entitled "Phase Four, Area One Bonds" in 1983 and 1985, respectively; and (4) $625,000 in special assessment bonds entitled, "Phase Four, Area Two Bonds" in 1985. The record also contains two resolutions and revenue certificates issued payable to CFD, Incorporated, in the amounts of $213,764 and $38,341 in 1988. In addition, there are no resolutions or trust indentures for "Phase Five Bonds," but the record contains an agreement between Phase Five Bondholders and the District, apparently entered into to avoid default on those bonds. This agreement states that the Phase Five Bonds totaled $18,365,000.
[3] The bondholders of the Phase Five Bonds are Van Kampen Merrit Tax Free High Income Fund and Van Kampen Merrit Investment Grade Municipal Trust. The record does not reflect whether there are other bondholders for the previous bonds.
[4] Ironically, in 1998 the electorate rejected a proposed amendment to the constitution that would have amended article VII, section 3(a), to delete the term "exclusively" and to specifically add special districts to the governmental entities entitled to claim exemptions for properties used for a public purpose. See Proposed Const. Revision No. 10, Const. Revision Comm'n (found in text at http://www.law.fsu.edu/crc/conhist/1998amen.html).
[5] We note that if the Property Appraiser had standing to raise the constitutionality of section 189.403(1), and if the statute were declared unconstitutional, the District would not be an entity entitled to claim an exemption for its property.