# Supreme Court of Florida

_____

No. SC2019-1819
_____

**PINELLAS COUNTY, FLORIDA,**
Petitioner,

vs.

**GARY JOINER, etc., et al.,**
Respondents.

June 27, 2024

GROSSHANS, J.

In this case, we consider whether sovereign immunity shields a county from the obligation of paying ad valorem taxes for property owned by that county but located outside its territorial boundaries.[1] We hold that it does not and approve the decision below, which reached the same conclusion. *Joiner v. Pinellas Cnty.*, 279 So. 3d 860, 862, 866 (Fla. 2d DCA 2019).

---

1. We have jurisdiction. *See* art. V, § 3(b)(4), Fla. Const.

## I

Pinellas County owns approximately 12,400 acres of real property in neighboring Pasco County. Although Pinellas County once paid ad valorem taxes to Pasco County for the property, it now claims that sovereign immunity relieves it of that obligation. Seeking to enforce for its position, Pinellas County filed suit against the Pasco County Property Appraiser. In its two-count complaint, Pinellas County asked the circuit court for a judgment declaring the property immune from ad valorem taxes and an injunction prohibiting future assessment and collection of such taxes.

Following limited discovery, Pinellas County moved for summary judgment, arguing that the property in Pasco County was not taxable based on principles of sovereign immunity. The Pasco County Property Appraiser filed its own motion for summary judgment arguing, in part, that Pinellas County's sovereign immunity from taxation did not extend into Pasco County.

The court held a hearing on the competing motions and ultimately entered summary judgment in favor of Pinellas County, ruling:

As a political subdivision of the state, Pinellas County is entitled to sovereign immunity which includes immunity from the ad valorem taxation of its properties. This immunity applies regardless of whether those properties are located within the boundaries of Pinellas County or in another county, within the state of Florida. Sovereign immunity can only be waived by the state of Florida. The state has not waived sovereign immunity for the ad valorem taxation of properties owned by counties outside their county lines.

The Pasco County Property Appraiser appealed. Disagreeing with the trial court's ruling, the Second District Court of Appeal reversed in a decision authored by Judge Atkinson. The district court noted that each county has statutory and constitutional authority to assess ad valorem taxes on "all property in the county." *Joiner*, 279 So. 3d at 864 (citing art. VII, § 9, Fla. Const.; § 125.016, Fla. Stat. (2014)). The district court also rejected Pinellas County's primary contention that its immunity from taxation extends beyond its own borders, noting that Pinellas County had not identified any supporting authority. *Id.* at 864-66. The district court further reasoned that although a county's "ad valorem taxation power must necessarily yield to the immunity of the State," it does not follow that "a county's taxation authority must yield to the immunity of another county, whose boundaries, of course, are neither

- 3 -

overlapping nor coextensive with any other county." *Id.* at 864.

After completing its analysis, the district court certified the

following question as being of great public importance:

> IS PROPERTY OWNED BY A COUNTY LOCATED
> OUTSIDE ITS JURISDICTIONAL BOUNDARIES IMMUNE
> FROM AD VALOREM TAXATION BY THE COUNTY IN
> WHICH THE PROPERTY IS LOCATED?

*Id.* at 866.

Judge Casanueva concurred with the majority, concluding

that "there is and can only be one sovereign in this case, and that

sovereign is Pasco County." *Id.* at 868 (Casanueva, J., concurring).

Unpersuaded by the majority and concurring opinions, Judge

Black dissented. He reasoned:

> [A] county's immunity from ad valorem taxation
> emanates from the State and not from the county itself[.]
> [Thus,] the immunity must necessarily extend to the
> boundaries of the State absent a clear and unequivocal
> waiver of that immunity. I have found no express waiver
> of a county's immunity from taxation in the controlling
> statutes as would be applicable to this case.

*Id.* at 871 (Black, J., dissenting).

After the Second District's decision issued, Pinellas County

sought discretionary review here based on the certified question.

- 4 -

II

Pinellas County argues that the district court erred in holding that its property in Pasco County was taxable.[2] According to Pinellas County, Florida's counties enjoy the same sovereign immunity from taxation as the State—a privilege that extends to county-owned land located anywhere in Florida. We disagree.

Though we have previously held that a county's real property is immune from that county's own efforts to assess ad valorem taxes, *see Park-N-Shop, Inc. v. Sparkman*, 99 So. 2d 571, 573-74 (Fla. 1957), Pinellas County has not identified any authority recognizing an immunity from taxation of the county's property located beyond its territorial boundaries. Nor, despite discussing a number of cases, does the dissent point to a decision holding that *counties* enjoy extraterritorial immunity from taxes. Absent such authority and consistent with how the parties have framed their arguments to us, we look to common-law sovereign immunity

---

2. The issue here presents a pure question of law, which is subject to de novo review. *See Knight v. State*, 286 So. 3d 147, 151 (Fla. 2019) (de novo review for assessing legal issue); *Naso v. Hall*, 338 So. 3d 283, 286 (Fla. 4th DCA 2022) (scope of sovereign immunity presents legal issue).

principles to determine if Florida counties, as political subdivisions of the state, are immune from taxation outside their borders.[3] Art. VIII, § 1(a), Fla. Const.; *see also Amos v. Matthews*, 126 So. 308, 321 (Fla. 1930) ("While the county is an agency of the state, it is also under our Constitution, to some extent at least, an autonomous, self-governing, political entity with respect to *exclusively* local affairs, in the performance of which functions it is distinguished from its creator, the state, and for its acts and obligations when acting in purely local matters the state is not responsible.").

We look to these common-law principles because, although counties do not have the same sovereignty as the State, they have been granted significant governmental authority within their respective spheres. Counties have the power to tax, § 125.01(1)(r), Fla. Stat. (2014); § 125.016, Fla. Stat. (2014); art. VII, § 9(a), Fla. Const., the power to make and enforce laws, § 125.01(1)(a)-(b), (d),

---

3. We address only the question of common-law sovereign immunity and do not consider whether Pinellas County's property could be statutorily exempt from taxation as that was not a basis for the trial court's order, nor did the district court pass upon this question.

(g)-(i), (o), (t), (w), (bb), Fla. Stat.; § 125.15, Fla. Stat.; § 125.56, Fla. Stat. (2014); § 125.86(2), Fla. Stat. (2014), the power to take private property and appropriate it for a county purpose, § 127.01, Fla. Stat. (2014), and all powers of local self-government not inconsistent with state law in the case of charter counties, § 125.81(1), Fla. Stat. (2014); § 125.86(8), Fla. Stat. These powers, just to name a few, are all indicia of sovereignty. And we have at least implied as much in our cases saying that sovereign immunity applies to counties in certain, but not all, contexts. *See Cauley v. City of Jacksonville*, 403 So. 2d 379, 381-82 (Fla. 1981) (noting English precedent supporting concept of "local government sovereign immunity"). Accordingly, we disagree with the dissent's assertion that our ensuing discussion on sovereign immunity is thus irrelevant. *See* dissenting op. at 23-24.[4]

---

4. We do not purport to define the scope and limits of a county's sovereignty. It is enough to say that whatever the sovereign status of counties is, Pinellas's and Pasco's status would be equal. Thus, our reliance on case law involving co-equal sovereigns is not misplaced as the dissent claims.

## III

The common-law doctrine of sovereign immunity traces to thirteenth-century England. *Barnett v. Dep't of Fin. Servs.*, 303 So. 3d 508, 512 (Fla. 2020). Kings reigned at the apex of the feudal system and, as a result of the king's position of preeminence, no one could subject him to suit or appeal his rulings. The same principle applied to lords: "[N]o lord could be sued by a vassal in his own court, but each petty lord was subject to suit in the courts of a higher lord." *Nevada v. Hall*, 440 U.S. 410, 414-15 (1979), *overruled on other grounds by Franchise Tax Bd. of Cal. v. Hyatt*, 587 U.S. 230 (2019).

Having developed these roots, the doctrine of sovereign immunity eventually made its way into American law. Initially, its recognition in the colonies was limited. *See* John J. Gibbons, *The Eleventh Amendment and State Sovereign Immunity: A Reinterpretation*, 83 Colum. L. Rev. 1889, 1896 (1983) (relying on colonial-government constitutions to "dispel the notion that governmental immunity was an accepted doctrine in eighteenth-century colonial America"); 1 Joseph Story, *Commentaries on the Constitution of the United States* § 207, at 149 (5th ed. 1891)

("[A]ntecedent to the Declaration of Independence[,] none of the colonies were, or pretended to be, sovereign states.").

Nevertheless, following the American Revolution, the doctrine gained widespread acceptance in this country—both at the federal and state levels of government. *Cohens v. Virginia*, 19 U.S. 264, 411-12 (1821) (recognizing federal government's sovereign immunity); *Principality of Monaco v. Mississippi*, 292 U.S. 313, 329-30 (1934) (recognizing state sovereign immunity); *Cauley*, 403 So. 2d at 381 ("The majority of American states fully embraced the sovereign immunity theory . . . ." (citing Restatement (Second) of Torts § 895B, comment a at 400 (1979))).

The doctrine of sovereign immunity became part of Florida law in 1829 when "[t]he common law of England in effect on July 4, 1776, was adopted" in Florida. *Barnett*, 303 So. 3d at 512 (alteration in original) (quoting *State v. Egan*, 287 So. 2d 1, 3 (Fla. 1973)); *see also Am. Home Assur. Co. v. Nat'l R.R. Passenger Corp.*, 908 So. 2d 459, 471 (Fla. 2005) (noting that section 2.01 of the Florida Statutes incorporated common law of sovereign immunity). "Under the common law, the [State of Florida's] immunity was

total," subject only to waiver by the Florida Legislature. *Am. Home Assur.*, 908 So. 2d at 477 (Cantero, J., concurring).

In time, courts recognized that Florida counties, like the State, enjoy sovereign immunity. This has been so for at least a hundred years. *See Keggin v. Hillsborough Cnty.*, 71 So. 372, 373 (Fla. 1916) (acknowledging county immunity; noting that under English common law, "a county . . . could not be subject to a civil action for a breach of its public duty").

Apart from showing the origins and development of sovereign immunity, history and the common law demonstrate that territorial boundaries matter for purposes of determining the scope of this doctrine. In one early case involving a dispute over a French warship, Chief Justice Marshall wrote that a sovereign, "by acquiring private property in a foreign country," "assum[es] the character of a private individual" as to that property. *The Schooner Exch. v. McFaddon*, 11 U.S. (7 Cranch) 116, 145 (1812); *cf. Upper Skagit Indian Tribe v. Lundgren*, 584 U.S. 554, 563 (2018) (Roberts, C.J., concurring) (characterizing this rule as "settled principle of international law"). Chief Justice Marshall added, "[T]he property of a foreign sovereign is not distinguishable by any legal exemption

- 10 -

from the property of an ordinary individual." *Schooner Exch.*, 11

U.S. at 144-45.

More than a century later, the Supreme Court relied on those

principles in *Georgia v. City of Chattanooga*, 264 U.S. 472 (1924).

There, Georgia purchased land in Chattanooga, Tennessee, to be

used as a railway yard. *Id.* at 478. Years after the purchase,

Chattanooga sought to condemn the Georgia-owned land, which

prompted Georgia to seek relief in the Supreme Court. *Id.*

Declining to grant the requested relief, the Supreme Court held:

> *Land acquired by one state in another state is held subject to the laws of the latter and to all the incidents of private ownership.* The proprietary right of the owning state does not restrict or modify the power of eminent domain of the state wherein the land is situated. Tennessee, by giving Georgia permission to construct a line of railroad from the state boundary to Chattanooga, did not surrender any of its territory, or give up any of its governmental power over the right of way and other lands to be acquired by Georgia for railroad purposes. *The sovereignty of Georgia was not extended into Tennessee.* Its enterprise in Tennessee is a private undertaking. It occupies the same position there as does a private corporation authorized to own and operate a railroad, and, as to that property, it cannot claim sovereign privilege or immunity.

*Id.* at 480-81 (emphasis added) (citations omitted); *accord The*

*Santissima Trinidad*, 20 U.S. (7 Wheat.) 283, 352-53 (1822)

- 11 -

(recognizing that a sovereign's power is "bounded by" its "*territorial limits*" (emphasis added)); *The Apollon,* 22 U.S. (9 Wheat.) 362, 370 (1824) (stating as a general rule that "[t]he laws of no nation can justly extend beyond *its own territories*" (emphasis added)); *Asociacion de Reclamantes v. United Mexican States*, 735 F.2d 1517, 1521 (D.C. Cir. 1984) ("A territorial sovereign has a primeval interest in resolving all disputes over use or right to use of real property *within its own domain.*" (emphasis added)); *Upper Skagit,* 584 U.S. at 568 (Thomas, J., dissenting) ("An assertion of immunity by a foreign sovereign over real property is an attack on the sovereignty of 'the State *of the situs.*' " (emphasis added) (citing *Competence of Courts in Regard to Foreign States*, 26 Am. J. Int'l L. Supp. 451, 578 (1932)))).[5]

From this discussion of history and the common law, we make two observations. First—despite the expansive history of sovereign immunity in Florida, America, and England—Pinellas County does not identify any historical practice here or abroad that supports its assertion of immunity from taxation for county-owned property

---

5.  We note that Pinellas County does not claim that it could, for instance, disregard Pasco County's land-use law.

located outside its borders.  Second, Pinellas County's position is inconsistent with the common-law principles discussed above on the scope of sovereign immunity and the significance of territorial boundaries.  We now turn to Pinellas County's primary arguments challenging the decision below.

IV

We start with Pinellas County's contention that the Second District's decision cannot be reconciled with well-established Florida case law on a county's immunity from ad valorem taxation. To be sure, there is case law broadly stating that a county enjoys immunity from ad valorem taxation.  *See, e.g.*, *Canaveral Port Auth. v. Dep't of Revenue*, 690 So. 2d 1226, 1228 (Fla. 1996); *Dickinson v. City of Tallahassee*, 325 So. 2d 1, 3 (Fla. 1975).  Though we acknowledge that this general principle may control in other cases, we do not mechanically apply it here.  Unlike the cases on which Pinellas County relies, this case involves county-owned property located outside that county's territorial boundaries.  Because of this significant factual distinction, Pinellas County's case law does not

support, much less mandate, disapproval of the Second District's decision.[6]

In making a related argument, Pinellas County claims that it derives immunity from the State, and thus, its immunity must be coextensive with the State's. And because the State would be immune from taxation if it owned land in Pasco County, Pinellas County should be too. We reject this argument as well.

Pinellas County is correct that each county partakes of the State's sovereign immunity from ad valorem taxation. *See* art. VIII, § 1(a), Fla. Const. ("The state shall be divided by law into *political subdivisions* called counties." (emphasis added)); § 196.199(1)(c), Fla. Stat. (2014) (creating tax exemptions for political subdivisions of the state, including counties); § 7.01-.67, Fla. Stat. (2014) (establishing boundaries for each of Florida's 67 counties);

---

6. The rule statements which Pinellas County relies on often do not mention geographic boundaries at all. *See, e.g., Dickinson,* 325 So. 2d at 3 ("The state and its political subdivisions, like a county, are immune from taxation since there is no power to tax them." (quoting *Orlando Utils. Comm'n v. Milligan,* 229 So. 2d 262, 264 (Fla. 4th DCA 1969))). Taken literally, such statements would encompass land located outside of Florida. However, even Pinellas County does not advocate such a broad view of its own tax immunity.

*see also Canaveral Port Auth.*, 690 So. 2d at 1228; *Arnold v. Shumpert*, 217 So. 2d 116, 120 (Fla. 1968); *City of Tampa v. Easton*, 198 So. 753, 756 (Fla. 1940).  But that does not mean each county enjoys that immunity coextensively with the State.  *See Amos*, 126 So. at 321 (recognizing principle that counties are not independent sovereigns because they derive their powers from the sovereign State).

Our constitution does not say, nor have we ever said, that a county can assert the State's sovereign immunity from taxation as to property outside the county's territorial limits.  These limits, drawn by the Legislature, tell us where one county ceases its enjoyment of the State's immunity from ad valorem taxation and another's begins.

To be clear, we do not infer a waiver from the Legislature's setting the geographic boundaries of each county, for "waiver will not be found as a product of inference or implication."  *Am. Home Assur.*, 908 So. 2d at 472.  Instead, we simply find that in setting each county's territorial boundaries, the Legislature established, in the *first instance*, the extent to which each county may assert the State's sovereign immunity from taxation.  This reconciles each

county's power to levy an ad valorem tax "upon all property in the county," *see* § 125.016, Fla. Stat., with its statutory exemption from taxation, *see* § 196.199(1)(c), Fla. Stat.[7]

Pinellas County also advances an argument likening the immunity asserted here with immunity applicable in cases where a county officer commits tortious conduct outside his or her county's border while carrying out official duties. But in this case, Pinellas County is not claiming immunity for the extraterritorial conduct of its officials. Rather, it claims immunity based on *its ownership* of extraterritorial land. As noted above, ownership of extraterritorial land is not an attribute of sovereignty; instead, the foreign sovereign owns such land subject to the laws of the sovereign where the property is located. *City of Chattanooga*, 264 U.S. at 480-81; *Upper Skagit*, 584 U.S. at 567-68 (Thomas, J., dissenting). Accordingly, even if Pinellas County accurately characterizes the tort-based case

---

7. Elsewhere in its reply brief, Pinellas County emphasizes statutes governing taxation and statutes authorizing counties to condemn land outside their geographic boundaries. Quite simply, its reliance on those statutes is misplaced because they do not in any way govern the scope of sovereign immunity which is at issue in this case.

- 16 -

law it cites, that case law does not support Pinellas County's

position.[8, 9]

## V

The dissent raises arguments unlike those advanced by

Pinellas County.[10]  In the dissent's view, we have looked to the

8.  Since our opinion is limited to taxation, we express no view on case law involving sovereign immunity in other contexts.

9.  Pinellas County also argues that public policy favors a recognition of tax immunity.  We have, in the past, considered policy objectives in determining whether to extend our jurisprudence on sovereign immunity to fit the facts of a given case.  Without reexamining that approach, we find that the policy considerations advanced in Pinellas County's briefs would not meaningfully further any particular policy interests at the local or state level.  Thus, these specific considerations, as briefed, have no bearing on the outcome of this case.

10.  The dissent proposes an interpretation of immunity not previously argued by the parties or considered by the courts below.  Though we disagree with the dissent on the merits, we also cannot endorse its departure from fundamental party-presentation principles.  *See United States v. Sineneng-Smith*, 590 U.S. 371, 375-76 (2020) ("[O]ur system 'is designed around the premise that [parties represented by competent counsel] know what is best for them, and are responsible for advancing the facts and argument entitling them to relief." (second alteration in original) (quoting *Castro v. United States*, 540 U.S. 375, 386 (2003) (Scalia, J., concurring in part and concurring in the judgment))); *D.H. v. Adept Cmty. Servs., Inc.*, 271 So. 3d 870, 888 (Fla. 2018) (Canady, C.J., dissenting) ("This requirement of specific argument and briefing is one of the most important concepts of the appellate process.  Indeed, it is not the role of the appellate court to act as standby

correct source—the common law—but discerned an inapplicable legal rule from it.

According to the dissent, there is a background common-law principle that counties and municipalities (or municipal corporations) are presumptively immune from taxation anywhere within the state they are located, so long as the land is used for a public purpose. Dissenting op. at 25-26, 28-31 (placing significant reliance on two secondary sources). We, however, think that the principle on which the dissent relies is incompatible with Florida law in several respects.

First, this rule treats municipalities and counties as essentially having the same status. But we know from our state's history and our precedent that counties and municipalities are not interchangeable governmental units under Florida law. *See, e.g., Am. Home Assur.*, 908 So. 2d at 477-78 (Cantero, J., concurring)

---

counsel for the parties." (citing *Polyglycoat Corp. v. Hirsch Distribs., Inc.,* 442 So. 2d 958, 960 (Fla. 4th DCA 1983))); *Berben v. State,* 268 So. 3d 235, 239 (Fla. 5th DCA 2019) (Grosshans, J., dissenting) (stressing that neutral role of appellate court is compromised when court raises own argument and reverses based on it).

(relying on Court's cases for proposition that counties enjoyed greater immunity than municipalities).

Second, Florida law routinely characterizes tax immunity as being a component of the larger concept of sovereign immunity. *See Cason v. Fla. Dep't of Mgmt. Servs.*, 944 So. 2d 306, 309-10 (Fla. 2006) (State has "sovereign immunity" from taxation; stressing sovereign status as basis for immunity from taxation; drawing sharp distinction between immunity from taxation and the exemption statutes); *Sun 'N Lake of Sebring Improvement Dist. v. McIntyre*, 800 So. 2d 715, 720 (Fla. 2d DCA 2001) ("Immunity from taxation is not derived from the state constitution; it arises from common law concepts of sovereign immunity." (citing *Dickinson*, 325 So. 2d 1)). And the dissent advances no argument that we should recede from or disapprove of this case law.

Third, as acknowledged by the dissent, Florida case law on tax immunity does not focus on use. *See* dissenting op. at 41 ("To date, it has been assumed that the county-owned property immunity rule, whatever its geographic scope, does not include a requirement that the owning county use the property for public purposes."). For instance, in *Dickinson*, we found that both the State and Leon

- 19 -

County had sovereign immunity from a utility tax imposed by the City of Tallahassee, but we did not focus on how the purchased utilities would be used. 325 So. 2d at 4.

Finally, the dissent's position seems incompatible with the principle that statutory exemptions must have a constitutional basis. *See Sebring Airport Auth. v. McIntyre*, 783 So. 2d 238, 247 (Fla. 2001) ("The Legislature is without authority to grant an exemption from taxes where the exemption has no constitutional basis." (quoting *Archer v. Marshall*, 355 So. 2d 781, 784 (Fla. 1978))). If the rule has always been that counties are presumptively immune from taxation anywhere in Florida, then it is hard to understand why we would be so demanding when it comes to the exemption statute, which the dissent characterizes as essentially declaring what the background law already was, *see* dissenting op. at 28, 31-32.

In addition, the dissent finds support for its position by comparing the prior version of the Florida Constitution with its current text. Dissenting op. at 33-40. The dissent's argument focuses on the fact that the current constitution no longer has a county exemption for municipal functions. Dissenting op. at 35-37.

It notes three decisions issued in the decade prior to the constitutional revision—those decisions broadly stating that county-owned land is immune from taxation. Dissenting op. at 37. In essence, the dissent asserts that the drafters and adopters felt safe in removing the municipal-function exemption based on the settled rule in our case law on county tax immunity. Dissenting op. at 37.

We find this assertion by the dissent to be speculative. Other than the mere timing of those three decisions in reference to the constitutional change, the dissent offers no evidence of original public meaning to support its rule. Put simply, we are not prepared at this point to take the dissent's "structural" leap of faith based on this limited evidence and absent briefing on this point.[11]

---

11. We make two final points. First, the dissent's analysis casts some doubt on the constitutionality of the county tax-exemption statute by suggesting that the current constitution does not fully support the statutory grounds for exemption. We cannot accept the dissent's position on this potential constitutional issue, especially in light of the limited (almost nonexistent) briefing on this issue. And second, though motivated by the well-meaning concern of maximizing legislative discretion, the dissent would achieve this goal by finding a constitutional basis for a rule set forth in two secondary sources. We, however, cannot agree with the dissent that constitutionalizing such a rule is within the scope of our judicial power.

Since neither history, nor our precedent, support Pinellas County's position, we decline to hold that common-law principles of sovereign immunity protect county-owned property from ad valorem taxation when that property is located outside the county's jurisdictional boundaries.  Accordingly, we answer the certified question in the negative and approve the Second District's decision.

It is so ordered.

LABARGA, COURIEL, and FRANCIS, JJ., concur.
MUÑIZ, C.J., dissents with an opinion, in which CANADY, J., concurs.
SASSO, J., did not participate.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

MUÑIZ, C.J., dissenting.

Beginning in *Park-n-Shop, Inc. v. Sparkman*, 99 So. 2d 571, 573-74 (Fla. 1957), our Court over many decades has said that county-owned property is immune from ad valorem taxation.  *Cason v. Fla. Dep't of Mgmt. Servs.*, 944 So. 2d 306, 309 (Fla. 2006); *Fla. Dep't of Revenue v. City of Gainesville*, 918 So. 2d 250, 255 (Fla. 2005); *Canaveral Port Auth. v. Dep't of Revenue*, 690 So. 2d 1226, 1228 (Fla. 1996); *Dickinson v. City of Tallahassee*, 325 So. 2d 1, 3

(Fla. 1975); *Hillsborough Cnty. Aviation Auth. v. Walden*, 210 So. 2d 193, 194-95 (Fla. 1968).  The certified question is about the scope of this immunity rule.  Does it apply only to county-owned property located within the owning county's territorial boundaries, as the Second District held in the decision under review?  Or does the immunity rule also apply to county-owned property located in a different Florida county?

The majority believes that our precedents discussing the immunity rule give insufficient guidance to answer the certified question.  So it answers the question by recourse to "common-law sovereign immunity principles."  To find those principles, the majority looks entirely to cases involving tax disputes between separate sovereigns—nations, states, and Indian tribes—even though the majority itself acknowledges that Florida counties are not sovereigns.  Analogizing to those cases, the majority concludes that tax immunity is limited to property within a county's own boundaries.

In my view, the majority's answer to the certified question is wrong for two basic reasons.  First, an exclusive focus on inapposite cases has caused the majority to overlook the common law

principles specific to the context of intrastate intergovernmental taxation. Those principles, not the rules that govern disputes between rival sovereigns, are the ones our Court relied on in announcing the immunity rule at issue. Under the common law, *all* county-owned property is presumptively immune, at least if it is used for a public purpose. Second, and more importantly, the majority does not account for the way the 1968 constitution incorporated this Court's then-existing immunity precedents. The structure of our governing constitution dictates that all county property is presumptively immune, subject to any legislative waiver of that immunity.

I would answer the certified question by saying that all county-owned property located in Florida is presumptively immune from ad valorem taxation. But I would also remand for consideration of (1) Respondent Pasco County's alternative argument that section 196.199(1)(c), Florida Statutes (2014), is best read as a limited waiver of sovereign immunity and (2) if so, how the statute applies to the property at issue in this dispute. The resolution of Pasco County's alternative argument could affect the tax status of county-owned property within the county's own

boundaries; that issue deserves to be litigated in the proper course, not decided in the first instance by this Court.

## I.

To understand the nature and scope of the immunity rule, it is necessary to know where it came from. Under the common law of intrastate intergovernmental taxation, the immunity doctrine is not the product of constitutional text or of statute. *See* 84 C.J.S. *Taxation* § 215 (1954) ("[I]mmunity from taxation . . . exists apart from any exempting statute or constitutional provision . . . ."); *Dickinson*, 325 So. 2d at 3 n.6 ("[T]he principle of immunity is not constitutionally dependent."). Nor does immunity in this context turn on inquiries into the "inherent power" of either the taxing or the property-owning entity. *See Collier Cnty. v. State*, 733 So. 2d 1012, 1019 (Fla. 1999) (Florida counties have no inherent power to tax, but derive their taxing authority from our state constitution and laws).

Instead, in the field of intrastate intergovernmental taxation, the common law immunity doctrine reflects assumptions about the extent of authority conferred by constitutional and statutory provisions that generally authorize taxation. The immunity doctrine

creates a background rule of interpretation holding that certain exclusions from taxation are so fundamental and obvious that they need not be embodied in an express exemption. Judge Cooley's authoritative treatise explains:

> Before noticing the exemptions expressly made by law, it will be convenient to speak of some which rest upon implication. Some things are always presumptively exempted from the operation of general tax laws, because it is reasonable to suppose they were not within the intent of the legislature in adopting them. Such is the case with property belonging to the state and its municipalities, and which is held by them for governmental purposes.

1 Cooley on Taxation 263 (3d ed. 1903).

The immunity doctrine sets a baseline against which constitutional drafters or legislators can operate.

Recognizing that the immunity doctrine is a background rule of interpretation clarifies what it means to ask about the scope of immunity for county-owned property. Here, no one doubts that Florida law confers on counties a general power of ad valorem taxation. The sources of that power are: article VII, section 4 of the Florida Constitution, which requires the Legislature to pass laws securing a "just valuation of all property for ad valorem taxation"; article VII, section 9(a), which requires the Legislature to authorize

counties to levy ad valorem taxes; and section 125.016, Florida Statutes (2014), which empowers counties to levy an ad valorem tax "upon all property in the county." But the common law immunity rule requires us to ask: is there an implicit exception to these general grants of taxing authority that shields from taxation property owned by one county but located in the territory of another? The governing common law principles tell us that the answer is yes.

Our opinion in *Orange State Oil Co. v. Amos*, 130 So. 707 (Fla. 1930), gives the earliest and best evidence of this Court's understanding of the applicable common law immunity rule. In that case, we noted the existence of an express statutory exemption for "[a]ll public property of the several counties, cities, villages, towns and school districts in this State, used or intended for public purposes." *Id.* at 709; *see* Comp. Gen. Laws 1927, § 897. A contemporary reader would have understood that "[a]n express exemption of property belonging to counties or municipal corporations includes property located outside the county or municipality." 2 Cooley, The Law of Taxation 1351 (4th ed. 1924).

The Court in *Orange State Oil* essentially said that it was unnecessary for the Legislature to have adopted this express exemption. Citing Cooley, we said: "Inasmuch as taxation of public property would necessarily involve other taxation for the payment of taxes so laid, such property is usually *excluded by implication* from the operation of laws imposing general taxes, unless there is a clear intent to include it." *Orange State Oil*, 130 So. at 709 (emphasis added). And then we said that the express statutory exemption, "in so far as it relates to cities and counties, is largely declaratory of the general rule independent of statute." *Id.* We further described the statute as "largely declaratory" of "general principles of law." *Id.* In other words, the "general rule," the "general principles," held that *all* county-owned property used or intended for public purposes is presumptively excluded from generally worded tax laws.

Nearly three decades would pass before our Court, in the 1957 *Park-n-Shop* case, explicitly declared that county-owned property is immune from taxation. Without citation to specific authority, we said: "After a careful study of appropriate provisions of the Constitution and the statutes we decide that property of the state and of a county, which is a political subdivision of the state, . . . is

*immune* from taxation, and we say this despite the references to such property [in Florida statute] as being exempt." *Park-N-Shop,* 99 So. 2d at 573-74. The reference at the end of this statement is to the same law we discussed in *Orange State Oil.*

The very next year, in *State ex rel. Charlotte County v. Alford,* 107 So. 2d 27 (Fla. 1958), our Court held that *state-owned* property is also immune from taxation. We explained: "Although our statutes specifically exempt such State owned lands, such exemption is not dependent upon statutory or constitutional provisions but rests upon broad grounds of fundamentals in government." *Id.* at 29 (footnote omitted). This time, we did cite authority: Corpus Juris (1933) and Corpus Juris Secundum (1954). *See id.* at 29 n.9 (citing those sources); *see also* 61 C.J. *Taxation* § 359 (1933) ("This immunity, although in some jurisdictions declared by constitutional or statutory provisions expressly exempting such property from taxation, is not dependent thereon, but rests upon public policy and the fundamental principles of government.").

The sources that our Court relied on in *Alford* simply recite the common law intrastate intergovernmental taxation rule articulated

by Cooley and by this Court in *Orange State Oil*: "[A]s a general rule, and in the absence of express statutory authority, public property, when devoted to public use, including not only the property of the state itself, but also the public property of its political subdivisions, such as counties and municipal corporations, is not subject to taxation." 61 C.J. *Taxation* § 343 (1933); *see also* 84 C.J.S. *Taxation* § 197 (1954). These sources emphasize that common law immunity applies based on public ownership and use of property for public purposes. They do not hint that the immunity is limited to the owning entity's territorial jurisdiction (assuming the property is intrastate, of course).

On the contrary, the most on-point authority indicates otherwise:

> Lands, buildings, and other property owned by municipal corporations and appropriated to public uses are but the means and instrumentalities used for governmental purposes, and consequently they are excluded from the operation of laws imposing taxes, *whether they are within or without the territory of the municipality which owns them*, although, under some statutes, property of a municipal corporation located outside the municipality may be subject to taxation. This immunity, not from necessity, but from abundant caution, is, in some jurisdictions, confirmed by constitutional or statutory provisions expressly exempting such property from taxation . . . .

- 30 -

84 C.J.S. *Taxation* § 202 (1954) (emphasis added).  While this passage speaks about "municipal corporations" and a generic "municipality," I have been unable to locate any authority suggesting that the common law rule was any different for counties.

Consider again the Florida tax exemption statute in effect in 1930 and 1957, when our Court decided *Orange State Oil* and *Park-n-Shop*.  Originally enacted in 1895, that law exempted from taxation "[a]ll public property of the several counties, cities, villages, towns and school districts in this State, used or intended for public purposes."  Ch. 4322, § 4, Laws of Fla. (1895).  Two features stand out.  First, the statute treats county- and city-owned property the same.  Second, it applies to "all" such property "used or intended for public purposes."  This is what our Court in *Orange State Oil* described as "largely declaratory of the general rule independent of statute."  130 So. at 709.

The majority does not consider the authorities that this Court relied on in developing our jurisprudence on intrastate intergovernmental tax immunity.  Instead, the majority relies entirely on cases arising in a different context—disputes between

rival sovereigns. Yet, as the majority itself acknowledges, Florida counties are not independent sovereigns. *Amos v. Matthews*, 126 So. 308, 321 (Fla. 1930) (a Florida county is not "an independent sovereignty"). Counties do not possess inherent powers of taxation. They are governed by a single sovereign, the State, under a single, unified body of law—a body of law that includes the accepted interpretive conventions described above. To find the correct answer to the certified question, it does not help to cite a case involving a property rights dispute between the states of Georgia and Tennessee, *Georgia v. City of Chattanooga*, 264 U.S. 472 (1924), or several cases involving disputes in federal court over foreign ships and their cargo, *The Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116 (1812); *The Santissima Trinidad*, 20 U.S. (7 Wheat.) 283 (1822); *The Apollon*, 22 U.S. (9 Wheat.) 362 (1824), or a case about an Indian tribe's sovereign immunity from a suit over immovable property located outside tribal lands, *Upper Skagit Indian Tribe v. Lundgren*, 584 U.S. 554 (2018). Each of these cases is far afield from the specific common law context at issue here.

For the reasons I have explained, the common law rule governing intrastate intergovernmental taxation tells us that there

are implicit exclusions to generally worded laws authorizing taxation by counties. Such exclusions extend to property owned by one county but located in another. Under the applicable common law rule, all county-owned property is presumptively immune from taxation, unless and until the Legislature expressly gives local government entities the authority to tax such property.

## II.

More important than any background rule of the common law, the structure of our governing 1968 constitution dictates that all county property is immune from taxation. This becomes especially apparent when one compares the 1968 constitution to its predecessor, Florida's 1885 constitution.

It helps first to set out some foundational principles. "[G]overnmentally owned property is generally excluded from taxation, through either immunity or exemption." *Fla. Dep't of Revenue*, 918 So. 2d at 255. Immunity is not dependent on any express constitutional provision. *Dickinson*, 325 So. 2d at 3 n.6 ("[T]he principle of immunity is not constitutionally dependent."). Nor is immunity something that the Legislature can confer. *Canaveral Port Auth.*, 690 So. 2d at 1228 ("The Florida Constitution

- 33 -

does not empower the legislature to designate what entities are immune from ad valorem taxation.").

By contrast, tax exemptions are a creature of express constitutional provisions or statutes. The Legislature, though, cannot grant exemptions that are not authorized in the constitution. *See L. Maxcy, Inc. v. Fed. Land Bank of Columbia*, 150 So. 248, 250 (Fla. 1933) ("The principle has been more than once affirmed in this state that the Constitution must be construed as a limitation upon the power of the Legislature to provide for the exemption from taxation of any classes of property except those particularly mentioned classes specified in the organic law itself."); *Archer v. Marshall*, 355 So. 2d 781, 784 (Fla. 1978) ("The Legislature is without authority to grant an exemption from taxes where the exemption has no constitutional basis."); *Sebring Airport Auth. v. McIntyre*, 783 So. 2d 238, 253 (Fla. 2001) ("It is not for this Court or the Legislature to grant ad valorem taxation exemptions not provided for in the present constitutional provisions.").

Now compare the 1885 constitution and the 1968 constitution that replaced it, neither of which expressly mentions tax immunity. The relevant provisions of the 1885 constitution are article IX,

section 1, and article XVI, section 16.  In *Holbein v. Hall*, 189 So. 2d 797, 798 (Fla. 1966), we said that "[a]ll statutes providing for tax exemption of any kind, with the exception of homestead and certain personal exemptions, must come within the ambit of these two sections."  (Emphasis omitted.)

Article IX, section 1 said:

The Legislature shall provide for a uniform and equal rate of taxation, and shall prescribe such regulations as shall secure a just valuation of all property, both real and personal, excepting such property as may be exempted by law for *municipal*, educational, literary, scientific, religious or charitable purposes.

(Emphasis added.)

Article XVI, section 16 said that "[t]he property of all corporations . . . shall be subject to taxation unless such property be held and used exclusively for religious, scientific, *municipal*, educational, literary or charitable purposes."  (Emphasis added.)

The corresponding portion of the 1968 constitution is article VII, section 3(a), which replaced the above-cited provisions from the 1885 constitution.  Article VII, section 3(a) says:

All property owned by a municipality and used exclusively by it for municipal or public purposes shall be exempt from taxation.  A municipality, owning property outside the municipality, may be required by general law

to make payment to the taxing unit in which the property is located.  Such portions of property as are used predominantly for educational, literary, scientific, religious or charitable purposes may be exempted by general law from taxation.

Viewed in contrast to the predecessor provisions from the 1885 constitution, three features of article VII, section 3(a) immediately stand out.  First, article VII, section 3(a) adopts a mandatory, self-executing exemption, but only for property owned and used exclusively by a municipality.  It is undisputed that, as used in the 1968 constitution, the term "municipality" does not include a county.  Second, the constitutional exemption applies to property owned by a municipality but located outside its boundaries, subject only to the enactment of a general law requiring the municipality to "make payment to the taxing unit in which the property is located."  Third, although article VII, section 3(a) retains a list of permitted exemptions, property used for "municipal purposes" is no longer on that list.

The most basic takeaway is that the drafters and adopters of the 1968 constitution took heed of this Court's decisions in *Park-n-Shop*, *Alford*, and *Walden*, the last of which reaffirmed the county-property immunity rule only months before the 1968 constitution

was placed before the voters for adoption. *Walden*, 210 So. 2d at 195. Informed by our cases holding that state- and county-owned property is immune from taxation, the drafters and adopters deemed it unnecessary to include a constitutional provision accounting for the possible taxation of such property. Article VII, section 3(a) reflects that decision in two ways: by providing a mandatory exemption that applies only to property owned and used by a municipality; and by removing the Legislature's discretion to exempt property used for "municipal purposes."

The latter point is key. In *Holbein*, decided only two years before the adoption of the 1968 constitution, our Court had emphasized that the constitutional validity of Florida's statutory exemptions for public property of all kinds depended on the "municipal purposes" provisions in article IX, section 1, and article XVI, section 16, of the 1885 constitution. This is what we said:

> Since these two sections are the source of all tax exemptions even the statute, . . . which provides for the tax exemption of property of the United States, this state and the public property of the several counties, cities, villages, towns and districts in this state, used or intended for public purposes, must come within their terms. The only way this can be accomplished is by giving a broad meaning to "municipal purposes" as used

in the foregoing sections of our Constitution and equating such with "public purposes."

*Holbein*, 189 So. 2d at 798.

In my view, it would not be reasonable to suppose that the drafters and adopters of the 1968 constitution (1) baked into the constitution an immunity rule that protects county-owned property only when it is located within the county's boundaries, and (2) simultaneously took away the constitutional means for the Legislature to exempt from taxation a county's extraterritorial (but intrastate) property. That result would be anomalous for several reasons.

First, counties are political subdivisions of the State. Art. VIII, § 1(a), Fla. Const. There should be a strong presumption that the drafters and adopters of the 1968 constitution would want to preserve legislative discretion to decide the intrastate intergovernmental tax status of such property. An immunity rule that applies to all county property, wherever located in the state, leaves the policy decision in the Legislature's hands, since the Legislature always retains the authority to waive any immunity in whole or in part. By contrast, because the 1968 constitution does

not contemplate discretionary exemptions for county-owned property, a county-boundary-only rule has the unintended effect of *requiring* the taxation of a county's extraterritorial property, tying the Legislature's hands.

Second, an immunity rule that excludes extraterritorial (but intrastate) county-owned property would contravene public policy that had been in place continuously from 1895 through 1968. As I have explained, an express statutory exemption, first adopted in 1895, applied to *all* county-owned property used or intended for public purposes. I am unaware of any evidence suggesting that the 1968 constitution was intended to displace that policy.

Third, an immunity rule that excludes extraterritorial (but intrastate) county-owned property would create an arbitrary disparity between counties and municipalities. Again, article VII, section 3(a) excludes a municipality's extraterritorial property from taxation unless the Legislature affirmatively requires the municipality "to make payment to the taxing unit in which the property is located." An all-county-property immunity rule would equalize the treatment of counties and municipalities, since an affirmative waiver of immunity would be the equivalent of the

payment-requiring mechanism contemplated in article VII, section 3(a) for municipalities. *Cf. Holbein*, 189 So. 2d at 799 ("It would be unreasonable to hold that the authors of our [1885] Constitution intended to permit the exemption of property held by municipalities from taxation while not extending such exemption to property held by counties, the state and other governmental units.").

In sum, an immunity rule that applies to all county-owned property is consistent with the structure and logic of the 1968 constitution; the majority's boundary-limited immunity rule is not.

III.

Even if the tax immunity rule applies to all county-owned property, there is no question that the State can waive that immunity in whole or in part by authorizing the taxation of such property. Pasco County makes the fallback argument that section 196.199 does just that, as to county-owned property that is not used for a governmental purpose. Section 196.199(1)(c), initially adopted as part of 1971's "Tax Reform Act," *see* ch. 71-133, Laws of Fla., declares: "All property of the several political subdivisions and municipalities of this state . . . which is used for governmental, municipal, or public purposes shall be exempt from ad valorem

taxation, except as otherwise provided by law." § 196.199(1)(c). The argument is that, even though the statute continues to speak of "exemption" from taxation, it is best read as a limited waiver of sovereign immunity.

There is academic support for this interpretation of the statute. *See* David M. Hudson, *Governmental Immunity and Taxation in Florida*, 9 U. Fla. J.L. & Pub. Pol'y 221 (1998). And reading the text this way honors the interpretive rule that, where possible, statutes should be construed in a manner that makes them effective. To date, it has been assumed that the county-owned property immunity rule, whatever its geographic scope, does not include a requirement that the owning county use the property for public purposes. That version of the immunity rule ignores the use limitation, applicable to all county-owned property, embodied in section 196.199(1)(c).

In any event, this issue was not litigated in the proceedings below. It warrants consideration on remand, assuming Pasco County raised the argument in the trial court.

CANADY, J., concurs.

Application for Review of the Decision of the District Court of Appeal Certified Great Public Importance & Class of Constitutional Officers

Second District - Case No. 2D2017-1040

(Pasco County)

Christy Donovan Pemberton, Managing Assistant County Attorney, and Donald S. Crowell, Chief Assistant County Attorney, Pinellas County Attorney's Office, Clearwater, Florida,

for Petitioner

Loren E. Levy and Sydney E. Rodkey of The Levy Law Firm, Tallahassee, Florida,

for Respondent Mike Wells, Jr., successor to Gary Joiner, Pasco County Property Appraiser

Frederick T. Reeves of Frederick T. Reeves, P.A., New Port Richey, Florida, and H. Clyde Hobby of Hobby & Hobby, P.A., New Port Richey, Florida,

for Respondent Mike Fasano, Pasco County Tax Collector

Edward G. Guedes of Weiss Serota Helfman Cole & Bierman, P.L., Coral Gables, Florida,

for Amicus Curiae Florida Association of County Attorneys